UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------X
ASHLEY TREANOR, MICHELLE CHAFFEE, and
DIGNA VALLADARES CONTRERAS,

                     Plaintiffs,

                -against-

NATIONAL DENTAL, PLLC,
NATIONAL DENTAL, LLC,
PRESTIGE EMPLOYEE ADMINISTRATORS, INC.,
PRESTIGE EMPLOYEE ADMINISTRATORS II, INC.,
NITIN DOSHI, ANISH BERRY, JUAN MALDONADO,
MARK GELFAND, and CHARLES HERTZOG,

                  Defendants.
----------------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No.: _____

Plaintiffs Ashley Treanor ("Ms. Treanor"), Michelle Chaffee ("Ms. Chaffee"), and Digna Valladares Contreras ("Ms. Valladares") (collectively, "Plaintiffs"), by their attorneys, Gerstman Schwartz, LLP, complaining of the Defendants National Dental, PLLC, National Dental, LLC (together, "National Dental"), Prestige Employee Administrators, Inc., Prestige Employee Administrators II, Inc. (together, "Prestige") (collectively, "Corporate Defendants"), Nitin Doshi ("Doshi"), Anish Berry ("Berry"), Juan Maldonado ("Maldonado"), Mark Gelfand ("Gelfand"), and Charles Hertzog ("Hertzog") (collectively, "Individual Defendants") (Individual Defendants and Corporate Defendants may be referred to collectively as "Defendants"), set forth and allege as follows:

**PRELIMINARY STATEMENT**

1.      The Plaintiffs—a top producing Dental Hygienist and two stellar Dental Assistants from different office locations—came to work for the Defendants expecting a professional and safe working environment—something all employees deserve. But

1

professionalism gave way to physical groping of intimate body parts, inappropriate gestures, and sexually charged comments and actions in private, before fellow staff, and near customers when the Defendants hired Dr. Charles Hertzog.

2.      Hertzog was a publicly known serial harasser who went from office to office groping female staff, proclaiming sexualized overtures, and subjecting the women in his vicinity to a concupiscent, lecherous sting that altered the terms and conditions of their employment.

3.      During his roughly six months with the Defendants, Hertzog harassed women *immediately*, prompting *at least four women* from at least *three different offices* to complain to management between on or about October 2017 and March 2018 about his sexual harassment.

4.      Rather than intervening, the Defendants attempted to cover up the hostile work environment they maintained by retaliating against Plaintiffs' good faith efforts to complain to management and defend their rights.

5.      Surprisingly, faced with Hertzog's illegal behavior, despite numerous reports from staff, made both verbally and in writing by numerous women, along with knowledge of Hertzog's criminal history involving similar issues in another state, the Defendants and their managerial staff did nothing except consciously allow a hostile work environment to fester openly *for months*.

6.      Hertzog's sexual harassment remained a spectacle during this period for all in the office to see. It was routine.

7.      He caressed and groped Ms. Treanor's thigh, sliding his hands towards her vagina, declaring that she's "got some nice legs."

8.      He would tell Ms. Chaffee to "get laid" and "get dick," unabashedly exclaiming that he would "fuck the little brain cells" she has "out of her."

2

9.      He even took it upon himself to assume that Ms. Valladares "would like to fuck" because "Spanish girls like to fuck." His attempts to entice Ms. Valladares included looking down at his crotch while sexually flicking his tongue and making eye contact with her in the process.

10.     These astonishingly vile actions—and more—occurred at Hertzog's whim _routinely_ in _different offices_, to _different women_, at _different times_.

11.     For these reasons, and those outlined below, Plaintiffs bring claims and seek recovery under Title VII of the Civil Rights Act of 1964, New York State Human Rights Law, and New York City Human Rights Law. Plaintiffs furthermore seek to recover for their constructive discharge and for the negligent hiring, supervision, and retention of Hertzog.

### JURISDICTION & VENUE

12.     This Court has original subject matter jurisdiction over the Title VII claims under 28 U.S.C. § 1331 and 1343 because they arise under the laws of the United States and are brought to recover damages for violations of civil rights.

13.     This Court has supplemental subject matter jurisdiction over the State and City claims under 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because the Defendants conduct business and can be found in this district; a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district; the alleged unlawful employment practices were committed here, and employment records relevant to that practice are maintained and administered here.

## ADMINISTRATIVE PREREQUISITES

15.     The Plaintiffs have satisfied all administrative prerequisites to commencing this action.

16.     Ms. Treanor timely filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 24, 2018.

17.     Ms. Chaffee timely filed her charge of discrimination with the EEOC on May 14, 2018.

18.     Ms. Valladares timely filed her charge of discrimination with the EEOC on June 12, 2018.

19.     The EEOC issued a right to sue letter for each Plaintiff dated March 15, 2019, which was received on March 18, 2019.

20.     Contemporaneously with the filing of this Complaint, Plaintiffs have served through Federal Express Overnight a copy of the same, along with a letter of explanation, to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

## PARTIES

A.     **The Plaintiffs**

21.     Plaintiff Ashley Treanor is a female Registered Dental Hygienist who at all times relevant herein was employed by National Dental and co-employed by Prestige until her constructive discharge on or about April 22, 2018. At all times relevant herein, Ms. Treanor was a resident of North Babylon, New York.

22.     Plaintiff Michelle Chaffee is a female Dental Assistant who at all times relevant herein was employed by National Dental and co-employed by Prestige until her constructive discharge on or about May 2, 2018. At all times relevant herein, Ms. Chaffee was a resident of Franklin Square, New York.

23.     Plaintiff Digna Valladares Contreras is a female Dental Assistant who at all times relevant herein was employed by National Dental and co-employed by Prestige until her constructive discharge on or about May 29, 2018. At all times relevant herein, Ms. Valladares was a resident of Maspeth, New York.

**B.     The Defendants**

**I.     *National Dental***

24.     Defendant National Dental, PLLC, is a domestic professional service limited liability company formed and operating under the laws of New York with numerous offices throughout New York, including New York City. Defendant National Dental, LLC, which also operates under the name National Dental Management, LLC, is a foreign limited liability company formed in Delaware and operating under the laws of New York.

25.     Upon information and belief, National Dental, LLC, is a management company that manages National Dental, PLLC, in addition to other corporate holdings.

26.     During all relevant times, National Dental employed each of the Plaintiffs.

27.     During all relevant times, National Dental was Plaintiffs' employer within the meaning of all relevant statutes.

28.     National Dental employs over 100 full-time employees in offices located in Manhattan, Queens, Nassau, and Suffolk. *See* Founder Nitin Doshi, National Dental (last visited May 9, 2019), *available at* https://lovenationaldental.com/founder-nitin-doshi-dds/ (claiming that

5

National Dental "owns and operates nine practices in Manhattan, Queens, Nassau, and Suffolk with 140 full-time employees and 25 dentists").

**II.   *Prestige***

29.     Defendants Prestige Employee Administrators, Inc. and Prestige Employee Administrators II, Inc. are domestic business corporations incorporated in and operating under the laws of New York with a principal executive office located at 538 Broadhollow Road, Melville, New York 11747.

30.     During all relevant times, Prestige co-employed each of the Plaintiffs.

31.     During all relevant times, Prestige and National Dental had a contractual agreement outlining their respective roles as employers of the Plaintiffs.

32.     In that agreement, upon information and belief, Prestige expressly agreed to co-employ National Dental staff and take on employment functions that would otherwise belong to an employer as defined by the statutes relevant herein.

33.     Upon information and belief, Prestige also assumed employment functions, such as payroll, as to Hertzog.

34.     Upon information and belief, Prestige is responsible for creating a handbook for National Dental.

35.     Upon information and belief, Prestige is responsible for distributing the handbook it created to National Dental staff.

36.     Upon information and belief, Prestige is responsible for maintaining acknowledgements that employees have received the handbook it created for National Dental.

37.     During all relevant times, Prestige was Plaintiffs' employer within the meaning of all relevant statutes.

6

### III.   *Nitin Doshi*

38.     Defendant Nitin Doshi is a dentist, owner, operator and the Founder of National Dental. Upon information and belief, Doshi is a resident of the State of New York. He employed and supervised the Plaintiffs; he has the power to hire, fire, set schedules, direct corporate policy, and make other employment decisions affecting Plaintiffs' terms and conditions of employment. He is also an "aider and abettor" under New York State and City Human Rights Law.

39.     Doshi is personally involved in day-to-day employment decisions concerning National Dental.

40.     In fact, he played a primary role is restructuring the way Hygienists would be paid, and he, together with Berry, Maldonado, and Gelfand, changed Ms. Treanor's pay structure first in retaliation for her good faith complaints of sexual harassment in order to force her out of National Dental.

### IV.   *Anish Berry*

41.     Defendant Anish Berry is, upon information and belief, the Chief Executive Officer ("CEO") of National Dental. Upon information and belief, he is a resident of the state of New York. He employed and supervised the Plaintiffs; he has the power to hire, fire, set schedules, direct corporate policy, and make other employment decisions affecting Plaintiffs' terms and conditions of employment. He is also an "aider and abettor" under New York State and City Human Rights Law.

42.     Berry is personally involved in day-to-day employment decisions concerning National Dental.

43.     In fact, Berry played a primary role is restructuring the way Hygienists would be paid, and he, together with Doshi, Maldonado, and Gelfand, changed Ms. Treanor's pay structure

first in retaliation for her good faith complaints of sexual harassment in order to force her out of National Dental.

**V.     *Juan Maldonado***

44.     Defendant Juan Maldonado is a supervisor and manager of numerous National Dental offices. Upon information and belief, he is a resident of the state of New York. He employed and supervised the Plaintiffs; he has the power to hire, fire, set schedules, further corporate policy, and make other employment decisions affecting Plaintiffs' terms and conditions of employment. He is also an "aider and abettor" under New York State and City Human Rights Law.

45.     Maldonado is personally involved in day-to-day employment decisions concerning National Dental.

46.     Following the sexual harassment complaints made against Hertzog, Maldonado was the primary National Dental manager/supervisor that actively worked to contain efforts by the Plaintiffs and others to report sexual harassment. As outlined below, he transferred Ms. Valladares from the East Williston to a split position in two Queens offices. He also threatened Ms. Chaffee that at the "end of the day no one will back you up" should she complain of the harassment she was experiencing, and Maldonado worked to secure support from other staff members to "back up" Hertzog and speak against Ms. Treanor.

**VI.     *Mark Gelfand***

47.     Defendant Mark Gelfand is the General Counsel of National Dental. Upon information and belief, he is a resident of the state of New York. He employed and supervised the Plaintiffs; he has the power to hire and fire, further corporate policy, and make other

employment decisions affecting Plaintiffs' terms and conditions of employment. He is also an "aider and abettor" under New York State and City Human Rights Law.

48.     Ms. Treanor is aware of past employees who Gelfand has terminated.

49.     Gelfand also addresses employment issues above and beyond terminations, and he was personally involved in the facts and circumstances surrounding the employment and retention of Hertzog.

50.     For example, upon information and belief, at all relevant times, Gelfand was aware that Dr. Hertzog had a criminal history involving drugs and inappropriate interactions with staff, which resulted in the loss of Herztog's Pennsylvania dental license.

51.     When numerous women began complaining of sexual harassment by Dr. Hertzog, including Ms. Treanor, Gelfand asked Hertzog whether he was sexually harassing staff.

52.     Specifically, at the time that Gelfand approached Hertzog about Ms. Treanor's sexual harassment complaint, Gelfand knew that Hertzog has a criminal history involving similar issues.

53.     Yet Gelfand decided to willfully ignore obvious indications that history was repeating itself and that Hertzog was sexually harassing staff.

54.     Gelfand was part of the reason that Hertzog was afforded a "second chance" to continue working with National Dental after the initial complaints of sexual harassment surfaced.

**VII.   *Charles Hertzog***

55.     Hertzog is a serial sexual harasser that has a publically available history of abusing staff and drugs alike. He is also an "aider and abettor" under New York State and City Human Rights Law.

56. Upon information and belief, he is a dentist currently licensed in New York. He is registered to License No. 057679. Hertzog was formerly licensed in Pennsylvania until he pleaded guilty for various drug-related felonies and harassment charges.

57. On or about December 2016, his PA license no. DS024908L was revoked. According to various online articles printed at the time, the criminal proceedings revealed that Hertzog was "also reported...making vulgar and inappropriate comments to staff and patients." *See* Kaitlyn Foti, *Dentist Admits Abusing Pills While Practicing*, THE MERCURY (Aug. 4, 2016).[1]

58. He was subsequently employed by National Dental and Prestige.

59. The Defendants were aware of Hertzog's criminal conviction on or about the time of his hire.

60. The Defendants hired Hertzog because they wanted to give him a second chance.

61. Upon information and belief, Gelfand has spoken with Hertzog's parole officer.

62. Upon information and belief, Gelfand spoke to Hertzog's parole officer before Hertzog was hired.

63. Upon information and belief, upon being terminated by National Dental on or about March 2018, he later joined Comfort Dental at Rocky Point, his current place of employment,[2] which is located at 347 Route 25A, Rocky Point, New York 11778.

---

[1] Kaitlyn Foti, *Dentist Admits Abusing Pills While Practicing*, THE MERCURY (Aug. 4, 2016), *available at* https://www.pottsmerc.com/news/dentist-admits-abusing-pills-while-practicing/article_e3068a0b-0ff6-5b3b-9b7e-66acfca7b213.html.

[2] *See* Charles Hertzog, Why Us, COMFORT DENTAL AT ROCKY POINT (last visited May 9, 2019), *available at* https://comfortdentalrockypoint.com/whyus.

**FACTUAL ALLEGATIONS**

A.     **Ashley Treanor**

     **I.**     ***Some background***

     64.     Ms. Treanor is a 27 year old female Registered Dental Hygienist.

     65.     Ms. Treanor began temping for National Dental, PLLC, on or about December 2016.

     66.     Ms. Treanor was employed as a full-time Dental Hygienist by National Dental from January 3, 2017, until her constructive discharge on April 22, 2018.

     67.     Upon information and belief, National Dental Management, LLC (also known as National Dental, LLC) manages National Dental, PLLC.

     68.     Pursuant to a co-employment agreement entered into between National Dental and Prestige, Ms. Treanor was also co-employed by Prestige on January 3, 2017.

     69.     Although she initially began at National Dental's Hicksville office location, she was placed in National Dental's East Meadow location as soon as she became a full-time employee on January 3, 2017.

     70.     Ms. Treanor performed her duties at all times in a professional and exemplary manner, and often received positive acclaim for her stellar performance. While employed by the Corporate Defendants, she was one of the top (if not *the top*) producing hygienist working for National Dental. Her work generated substantial revenue and clientele for National Dental.

     **II.**     ***The First Hertzog Encounter: A Thigh Grab & Sexually Harassing Comments***

     71.     On Thursday, October 26, 2017, Hertzog filled in for an absent dentist at National Dental's East Meadow office location.

11

72.    Throughout the entire day of October 26, 2017, Hertzog repeatedly and publically subjected Ms. Treanor to sexually harassing comments and unwelcomed physical groping.

73.    For example, Ms. Treanor was wearing long tube socks with black stripes under her work-required uniform: white scrubs. While she was resting her legs on the desk in her work room filling out charts, Hertzog appeared and suddenly began caressing and groping her thigh in a sexual manner. Edging his hand toward Ms. Treanor's vagina, his voice dripped with sexual tone: "Ohhhhh, what's underneath here?" As if grading Ms. Treanor's appearance, he proceeded to tell Ms. Treanor that she's "got some nice legs."

74.    Feeling overwhelmingly violated, her heart pounding uncontrollably, Ms. Treanor became so frightened, anxious, and distraught by the altercation with Dr. Hertzog that she vomited in the restroom.

75.    Fearful of another encounter, Ms. Treanor attempted to avoid Dr. Hertzog for the rest of the day. Her efforts were unsuccessful.

76.    Throughout the rest of the workday, Hertzog would randomly and repeatedly appear in spectral fashion to look Ms. Treanor up and down with ghastly eyes as if she were a piece of meat. Regardless of which room of the office she was located or who else was present, Hertzog was there to ogle.

77.    Ms. Treanor reported this sexual harassment, including the unwelcomed physical groping, to her Office Manager, Claudia Paye, who blurted out in response, "He's such a fucking creep, right? He was making comments about my ass while I was in the lab."

78.    Other female staff members in the office on October 26 had similar experiences with Hertzog, reporting to Claudia and telling Ms. Treanor that Hertzog was "crazy and out of his mind" for making sexual comments and leering sexually at clientele and staff.

79.     Claudia told Ms. Treanor that she would inform Anish Berry, the CEO of National Dental.

80.     Upon information and belief, Berry told Claudia that Doshi had sat Hertzog down in the past to discuss his inappropriate interactions with staff and patients.

81.     Berry said he would speak with Hertzog.

**III.    *The Second Hertzog Encounter: "[W]hy Didn't You Get Her Pounded Out on New Year's Eve?"***

82.     Remarkably, a few months later on January 10, 2018, Hertzog was afforded another chance, and he returned for the work at the East Meadow location once again.

83.     Hertzog picked up where he left off with his sexual harassment. Throughout the day, he unleashed a barrage of sexual overtures before staff and clients, making Ms. Treanor and others visibly uncomfortable.

84.     While examining his first patient, Dr. Hertzog asked, "How's the cleaning? She's [(referring to Ms. Treanor)] cool, right? Easy on the eyes?"

85.     On another occasion during January 10, while a young boy (in his early teens) was being examined, Hertzog repeatedly prodded Ms. Treanor for details surrounding her personal romantic life.

86.     He asked to see a picture of her boyfriend.

87.     When he noticed that her boyfriend was pictured on Ms. Treanor's phone he said, "I wouldn't trust a guy like that; trust me, I can do you better than he can."

88.     While greeting an elderly female patient, Hertzog publically flirted his way through the office, grabbing and kissing the woman's hands, hugging her as she stood up, and telling her she's "just the right height" as he squeezed her close to himself.

13

89.     While Ms. Treanor was helping a Dental Assistant (Ms. Chaffee) clean a room, Hertzog was treating a patient. When Ms. Chaffee expressed concern about Ms. Treanor's upcoming trip to Thailand, Hertzog injected himself in their conversation with the following comments while making a sexual, lewd fist-pumping motion: "Are you really friends with this girl? Then why didn't you get her pounded out on New Year's Eve? It would've been good for her. It would've knocked out the few brain cells she has left." He added that Ms. Treanor should get herself a "Thai Stick" while in Thailand.

90.     While Ms. Treanor was working with her last patient of the day, Hertzog leaned in the doorway and asked, "How old is this guy? How old are you, buddy?" Then he loudly proclaimed, "We should get Michelle in here to help you out, if you know what I mean. She needs a taste of some dick." According to the office receptionist, the patient's wife came in shortly after, demanding to know where her husband was and when he will be finished. Upon information and belief, the patient related Hertzog's comments to his wife through text message.

91.     When Ms. Treanor again complained to Claudia about the severe and pervasive, sexually harassing, hostile work environment created by Hertzog, she was directed to write an email to Gelfand.

### IV.     *The E-Mail To Gelfand & Lacking Response*

92.     On January 12, 2018, Ms. Treanor sent Gelfand an email generally recounting the events of January 10, as she was specifically told to only write about the January 10th experience with Hertzog, not the October 26, 2017, altercations.

93.     On Friday, January 12, 2018, Ms. Treanor reported to Gelfand via email the sexual harassment she experienced by Hertzog on January 10, 2018.

94.     She wrote that:

   a. "He repeatedly asked about my boyfriend and what he did for a living. He was
      making side comments and 'joking around' with me in a perverted manor
      [sic]."

   b. "He was obnoxiously flirting with a woman in her 70's, asking how long she's
      been divorced, and how long she's been with her new husband. He proceeded
      to grab and kiss her hands, hugging her when she stood up." Ms. Treanor
      explained that this "whole situation was just extremely uncomfortable for
      me."

   c. While Ms. Treanor was working with Ms. Chaffee, Hertzog asked why Ms.
      Treanor did not get Ms. Chaffee "pounded out (first motion and all) on New
      Year's Eve?" "It would've been good for her," he explained. "It would've
      knocked out the few brain cells she has left." Throughout the day of working
      with Ms. Chaffee, Hertzog also said "she needs a taste of some dick."

   d. Hertzog "stares at every girl, and looks us up and down deliberately being a
      creep."

95.    In closing her email to Gelfand, Ms. Treanor explained that "I actually googled
him when I left and wasn't the slightest bit surprised about what I read. (I'm more than confident
patients are doing the same.)"

96.    A simple Google search, as described by Ms. Treanor, would have revealed
numerous articles concerning Hertzog and his criminal past.

97.    Following a search for "Charles Hertzog dentist," numerous relevant results
appear.

15

98.     The first article, for example, is entitled "Dentist Admit Abusing Pills While Practicing."[3] According to that article, in addition to describing Hertzog's "felony controlled substances charges," also "reported Hertzog making vulgar and inappropriate comments to staff and patients." The article also explained that Hertzog was "ordered to surrender his Pennsylvania DEA license with withdraw[al of] an application for another in New York."

99.     Despite now having this information indisputably at the Defendant's disposal, Gelfand inquired with Hertzog who (no doubt) allegedly denied sexually harassing anyone. Upon information and belief, satisfied by the word of an ex-felon with prior experience harassing staff, Gelfand—knowingly or recklessly understanding the risk that Hertzog would continue harassing staff—did nothing further.

100.    Upon information and belief, National Dental did not have a sexual harassment policy or procedure in place known by the staff, including Ms. Treanor.

101.    Soon after emailing Gelfand, Maldonado found Ms. Treanor and asked her "what the fuck happened" with Hertzog. Once Ms. Treanor informed him, Maldonado couldn't believe Hertzog was acting in such a manner "right in front of the fucking patients." And from what Ms. Treanor has been told, Maldonado has been attempting to coerce other staff members to "back up" Hertzog and speak against Ms. Treanor and other sexual harassment victims in the office.

102.    Before leaving her to continue her work, Maldonado directed Ms. Treanor not to speak with or tell anyone else about her allegations against Hertzog.

103.    Despite Ms. Treanor's repeated reports of Dr. Hertzog's sexually harassing behavior to her Office Manager, the General Counsel, and other superiors, the Defendants did nothing to appropriately remedy the situation.

---

[3] Kaitlyn Foti, *Dentist Admits Abusing Pills While Practicing*, THE MERCURY (Aug. 4, 2016), *available at* https://www.pottsmerc.com/news/dentist-admits-abusing-pills-while-practicing/article_e3068a0b-0ff6-5b3b-9b7e-66acfca7b213.html.

104.   Upon information and belief, no investigation has taken place by the Defendants.

105.   Upon information and belief, no mechanism has been established to prevent such sexual harassment from happening again.

## V.   *Retaliation and Constructive Discharge*

106.   Since reporting the sexual harassment, Ms. Treanor's employers had been changing her schedule. During the first two weeks of April 2018, Ms. Treanor was told to leave early and start late.

107.   On April 18, 2018, Ms. Treanor was called into a meeting with Berry, Claudia, Dr. Sheth, and Pamela (an assistant). At this meeting, she was told that National Dental was restructuring how employees would be paid. Instead of being paid by the hour, plus commission and bonus, she was informed that she would only be paid a percentage of production, which is tantamount to a substantial pay cut. Upon information and belief, Mr. Treanor was the first and only affected employee that was informed of this change on this day.

108.   On April 21, 2018, only days after Mr. Treanor's attorneys alerted the Defendants as to their representation of Mr. Treanor, she was unable to log into the company scheduling software. Upon information and belief, National Dental blocked Ms. Treanor's access to the company software.

109.   Voicing her feelings that the totality of the above circumstances have created an intolerable working environment, Ms. Treanor was constructively discharged on April 22, 2018.

## B.   Michelle Chaffee

### I.   *Some Background*

110.   Ms. Chaffee is a 30 year old female Dental Assistant.

111.    She began working for the Defendants on or about September 2017. She was employed by National Dental, and pursuant to a co-employment agreement entered into between National Dental and Prestige, Ms. Chaffee was also co-employed by Prestige on or about the same time.

112.    Ms. Chaffee's time was split between the East Meadow and Hicksville locations until her constructive discharge on May 2, 2018.

113.    During her time at National Dental, in addition to being repeatedly sexually harassed by Hertzog, Ms. Chaffee was routinely subjected to unprofessional name-calling and jousting by her supervisor, Maldonado.

**II.    *Hertzog to Chaffee: I'll "Fuck The Little Brain Cells" You Have Out Of You Management to Chaffee: "At The End Of The Day, No One Will Back You Up"***

114.    On Thursday, October 26, 2017, Hertzog filled in for an absent dentist at National Dental's East Meadow location.

115.    Throughout the entire day of October 26, 2017, Hertzog repeatedly and publically subjected Ms. Chaffee and other female staff members in the East Meadow office to sexually harassing comments.

116.    Upon information and belief, a female co-worker made a video capturing some of these incidents, but Maldonado, a manager, later told her to delete the video.

117.    Ms. Chaffee subsequently reported to her East Meadow office manager, Claudia Paye, that Hertzog was being inappropriate with staff and clients. According to Claudia, the staff was making a list of reasons why Hertzog should not be permitted to return to work in East Meadow.

118.    Suddenly, Ms. Chaffee was told by Maldonado that she was being switched to work in the Hicksville office location. Her first day in Hicksville was October 31, 2017.

18

119.    On October 31, 2017, her first day in the Hicksville office, Maldonado told Ms. Chaffee not to tell anyone at the Hicksville office about the  sexually harassing behavior she witnessed and experienced from Hertzog in East Meadow.

120.    During her time in Hicksville, Maldonado praised Ms. Chaffee's work, telling her that she was appreciated and a good fit, adding that he could see her taking on additional responsibilities in the future. Maldonado told Ms. Chaffee that she would be promoted to cultivating National Dental's social media platforms in the corporate office.

121.    As Hertzog spent more time in the Hicksville office, Ms. Chaffee's working environment became increasingly hostile with rude and sexual comments being directed at her and the clients and staff throughout the day.

122.    For example, Hertzog smirking told a female patient who complained of a gagging problem that he was surprised she had one, implying that she frequently performed oral sexual acts.

123.    On another occasion, in the beginning of a dental appointment, Hertzog stroked the hair of a female patient in front of Ms. Chaffee.

124.    Hertzog would also often tell Ms. Chaffee in front of patients and staff that she "needed a good dick" and that she should "get dick." Hertzog would go out of his way to tell Ms. Chaffee that she should "get laid." One of these dick-related comments was delivered to Ms. Chaffee on Valentine's Day.

125.    Hertzog would also offer to take Ms. Chaffee and Jenna (a hygienist) out to dinner, explaining that he would "fuck the little brain cells" Ms. Chaffee had "out of her."

126.    In one particular instance, Ms. Chaffee covered for another dental assistant in the East Meadow office. Ms. Chaffee was talking with a fellow hygienist (Ashley Treanor) while Dr.

19

Hertzog was treating a patient. When Ms. Chaffee expressed concern about Ms. Treanor's upcoming trip to Thailand, Hertzog injected himself in their conversation with the following comments: "Are you really friends with this girl? Then why didn't you get her pounded out on New Year's Eve? It would've been good for her. It would've knocked out the few brain cells she has left."

127.    Hertzog would openly make comments before others about his desire to "fuck" Ms. Chaffee.

128.    Hertzog shamelessly praised himself for not needed a "blue pill." One day, while Ms. Chaffee was eating lunch with other co-workers, Hertzog joined them and proclaimed his love of "eating a woman out," expressing discontent that a woman he had been with did not enjoy oral sex. Ms. Chaffee and the rest of the female co-workers in the room were visibly disturbed by Hertzog's remarks as they were attempting to enjoy their lunch.

129.    The Defendants and their agents knew about Hertzog's behavior but they repeatedly ignored it and permitted it to continue.

130.    Shortly after January 10, 2018, management was again made aware of the continued sexual harassment by Hertzog against National Dental's female staff, including Ms. Chaffee. Ms. Chaffee was called into Maldonado's office to discuss the sexual harassment directed at her by Hertzog. Upon information and belief, no action was taken following the meeting, which emboldened Hertzog to continue his sexual harassment. Hertzog continued his harassment for weeks to follow.

131.    Soon after her meeting with management to discuss the ongoing sexual harassment by Hertzog, Ms. Chaffee was suddenly and unexpectedly reprimanded before the entire staff, including Dr. Hertzog, and told that she had two weeks in order to change.

132.     After two weeks passed without any qualms, Ms. Chaffee was called into another meeting with Maldonado and her office manager, Claudia, where Ms. Chaffee was told that she was "getting too close to Jenna" (another sexual harassment victim who has also sued the Defendants for sexual harassment), that her "job was in jeopardy," and "she should only worry about [herself]" because at the "end of the day no one will back you up." Maldonado made sure to emphasize that whatever happens in the office, stays in the office, which would enable him to "protect us."

133.     Soon after this meeting, Ms. Chaffee was sent home early, and she was increasingly subjected to teasing by Maldonado who developed a habit of referring to Ms. Chaffee as "the carrot" (due to her spray tan). Maldonado would mock Ms. Chaffee's laugh by snorting in her face.

134.     Noting the increasingly hostile words, actions, and Maldonado's constant use of Spanish to communicate with other employees at the exclusion of Ms. Chaffee, Ms. Chaffee asked her East Meadow office manager, Claudia, if she could work in East Meadow more often than Hicksville since Maldonado frequented the Hicksville location.

135.     Soon after, Maldonado had another meeting with Ms. Chaffee, telling her that "her attitude has changed." Ms. Chaffee explained that she felt he was treating her differently after the sexual harassment allegations against Hertzog were made.

136.     Upon information and belief, knowing that Ms. Chaffee was attempting to spend more time in East Meadow and away from Maldonado in the Hicksville office, Maldonado worked to ensure that she would instead be spending additional time in his office location: Hicksville.

21

137.    The aforementioned promotion she was offered regarding social media management for National Dental never materialized after Ms. Chaffee voiced sexual harassment allegations against Dr. Hertzog.

138.    Despite Ms. Chaffee's repeated efforts to report and oppose the sexually harassing and otherwise hostile working environment created by Hertzog, Maldonado, and the rest of the Defendants, the Defendants did nothing to appropriately remedy the situation.

139.    Upon information and belief, no investigation has taken place by the Defendants.

140.    Upon information and belief, no mechanism has been established to prevent such sexual harassment from happening again.

141.    Since reporting the sexual harassment and until her constructive discharge, as explained above, Ms. Chaffee's employers had been changing her schedule and creating an increasingly intolerable working environment.

142.    Voicing her feelings that the totality of the above circumstances has created an intolerable working environment, Ms. Chaffee was constructively discharged on May 2, 2018.

C.    **Digna Valladares Contreras**

    **I.**    *Some Background*

143.    Ms. Valladares is a 31 year old, female Dental Assistant.

144.    She began working for the Defendants on or about January 2018. She was employed by National Dental, and pursuant to a co-employment agreement entered into between National Dental and Prestige, Ms. Valladares was also co-employed by Prestige on or about the same time.

145.    Temping before January 2018, Ms. Valladares began working in National Dental's Williston Park office full time on or about January 2018.

## II.   *Hertzog to Valladares: You Look Like Someone "Who Would Like to Fuck"*

146.   As a Dental Assistant working with Hertzog, Ms. Valladares was subjected to sexual harassing comments and actions by Hertzog soon after being hired.

147.   For example, on or about the beginning of February 2018, Ms. Valladares was in the lab along with Hertzog. While working on denatures, he turned to Ms. Valladares and stated that she looks like someone "who would like to fuck," adding that "Spanish girls like to fuck." Apparently impressed with himself, Hertzog then exclaimed, referring to himself, "You can't handle this!"

148.   When Hertzog finished showing Ms. Valladares how to work on dentures, they returned to a patient who was situated in one of the dental rooms. As Hertzog sat down in his chair, he looked down at his crotch while making eye contact with Ms. Valladares and then suggestively and sexually flicked his tongue at her. Ms. Valladares was stunned and visibly disturbed by the overtly sexual, inappropriate and vulgar gesture.

149.   Hertzog would shamelessly and frequently flick his tongue at Ms. Valladares in this manner, making his sexual desires towards Ms. Valladares known. He would often make eye contact with Ms. Valladares, stare down at his crotch, and look back at her while flicking his tongue in a sexual manner in a pantomime of oral sex.

150.   The following week, on or about the middle of February 2018, Hertzog asked whether Ms. Valladares was married, saying "so you're not going to date an old man...." Perturbed by his comments, Ms. Valladares denied Hertzog's sexual overtures and added that her parents would not want her to date an older man like Hertzog.

151.    Dr. Hertzog's continuing sexual harassment also began affecting Ms. Valladares' personal life, causing anxiety and distress as she attempted to address Hertzog's behavior with National Dental without telling her husband about Hertzog's sexual harassment.

### III.    *Reporting The Sexual Tongue Flicking & The Retaliatory Transfer*

152.    On or about March 15, 2018, just before the last patient appointment of the day, Hertzog—just as he had done many times before—made eye contact with Ms. Valladares, stared at his crotch, and looked back at her while flicking his tongue in a sexual manner. Ms. Valladares sternly told Hertzog that this behavior is not professional.

153.    Agitated that Ms. Valladares had stood up to his sexually harassing behavior, Hertzog called Ms. Valladares into his office at the end of the day after he finished working on the last patient. Behind closed doors and in response to Ms. Valladares' comment that his behavior was "unprofessional," Hertzog unleashed a barrage of inappropriate accusations. "What the fuck is wrong with you? Are you smoking week? Cocaine?"  Hertzog demanded. He asked whether Ms. Valladares was having a problem with her husband.

154.    Visibly shaken by the altercation with Hertzog, Ms. Valladares quickly attempted to speak with Maldonado, hoping he would step in and address Hertzog's sexual harassment and verbally abusive comments. Ms. Valladares told Maldonado that she needed five minutes of his time.

155.    Ms. Valladares reported Hertzog to Maldonado. Ms. Valladares told Maldonado that when she told Hertzog he was being unprofessional, Hertzog berated her behind closed doors, accusing Ms. Valladares of using various illegal drugs and having issues with her husband. Ms. Valladares also demonstrated how Hertzog would sexually flick his tongue at her and explained that his behavior made her feel extremely uncomfortable.

24

156.    To Ms. Valladares' surprise, instead of addressing her concerns, Maldonado appeared to have been already aware of Hertzog's behavior. Defending Hertzog and dismissing Ms. Valladares' report of sexual harassment, Maldonado said Hertzog had already spoken to him, that he does not care about Ms. Valladares' family problems, and that Hertzog simply did not like how Ms. Valladares worked with him.

157.    Distressed, Ms. Valladares returned to her office area to clean up for the day. Overwhelmed, she began to cry. Another dental assistant, Dalia, who overheard the crying, came to comfort Ms. Valladares. The dental assistant was all too familiar with Hertzog's inappropriate behavior; she advised that Ms. Valladares' "get strong" with Hertzog.

158.    Upset by the sexual harassment and National Dental's disregard for the situation, Ms. Valladares argued with her husband when he asked about her day after sensing something was wrong.

159.    On or about March 16 and March 17, Ms. Valladares was out of town with her husband. She told her husband that she was going to have to leave National Dental.

160.    On or about March 20, Ms. Valladares returned to the Williston Park office. She remembered that for the past month or so, Dr. Tiffany Konklewski—a dentist at the Williston Park office—would tell her that if something ever happens with Hertzog to let her know. Ms. Valladares told Dr. Konklewski that she does not want to work with Hertzog anymore, and she explained how he sexually harasses her and told Dr. Konklewski about his inappropriate behavior. Ms. Valladares mentioned to Dr. Konklewski that if she hires an attorney, Hertzog could get in trouble. Dr. Konklewski advised her that as a woman who is being harassed, she should speak up.

25

161.    On or about March 21, Maldonado called Ms. Valladares into his office and told her that she will no longer work with Hertzog. Ms. Valladares later discovered that Hertzog was no longer employed by National Dental.

162.    During lunch, Ms. Valladares was speaking with another dental assistant, Denisse—the head assistant working under Dr. Jeffrey Fox. Discussing her experiences with Hertzog and management's disregard of her complaints, Dr. Fox's dental assistant told her that Hertzog was fired because he did something in appropriate. She showed Ms. Valladares an email written by a National Dental hygienist complaining of sexual harassment. Upon information and belief, Dr. Fox was planning to bring Hertzog to work in his office until he discovered that Hertzog was sexually harassing National Dental staff.

163.    Soon after Ms. Valladares spoke to Dr. Fox's dental assistant about the abovementioned experiences with Hertzog and Maldonado, she noticed that Maldonado had an attitude towards her. Maldonado would avoid interacting with Ms. Valladares.

164.    On or about April 2, Ms. Valladares was told to "cover" for another dental assistant at National Dental's Oakland Gardens office. When Ms. Valladares arrived at the Oakland Gardens office, the staff welcomed her as if she were a new staff member joining the Oakland Gardens team. To her surprise, Ms. Valladares discovered that she was not actually "covering" for another dental assistant. Instead. Maldonado permanently transferred her away from her Williston Park office to Oakland Gardens. Adding insult to injury, Ms. Valladares was later informed that she would also be split between two National Dental offices: Oakland Gardens and Douglaston. She was the only Dental Assistant split among these two offices.

165.     On or about April 2, Ms. Valladares texted Maldonado to discuss why she was unexpectedly transferred to a different office. Maldonado nonchalantly stated that she is "the perfect one" for the transfer. The transfer was retaliatory.

**IV.     *A "Good Opportunity to Start Over": They Knew He Was a Sexual Harasser***

166.     Feeling that the transfer was motivated by her complaints of sexual harassment and discussions with co-workers about Hertzog, Ms. Valladares spoke with Doris Navarro, a manager of Oakland Gardens, about her experiences with Hertzog, Maldonado, and the Defendants' overall disregard of her complaints. She asked Doris why National Dental would hire someone like Hertzog. Interestingly, Doris revealed that National Dental's Founder, Nitin Doshi, was aware of Hertzog's dangerous past. According to Doris, National Dental knew of Dr. Hertzog's background but decided to hire him anyway in an effort to provide him with a "good opportunity to start over." Doris advised that that the entire situation should be left to God, adding that Ms. Valladares is now "going to be in great hands."

167.     Ms. Valladares mentioned to Doris that if she were to get an attorney involved, Hertzog and National Dental could get into trouble for what they have done. Doris discouraged Ms. Valladares from contacting an attorney and attempted to persuade her to let National Dental deal with everything internally. Doris specifically told Ms. Valladares: "don't do anything. Don't hire a lawyer. Let's not go there. He doesn't work here anymore. Leave it alone."

168.     At first, Ms. Valladares followed Doris' direction and did not pursue any legal action against the Defendants. But Ms. Valladares soon heard that women from other National Dental offices had also been subjected to sexual harassment at the hands of Hertzog. After being referred to and speaking with other National Dental current and former employees who were

sexually harassed by Dr. Hertzog, including Ms. Treanor, Ms. Valladares learned that she was not alone.

169.    On May 29, 2018, voicing her feelings in an email that the totality of the above circumstances has created an intolerable working environment, Ms. Valladares was constructively discharged.

170.    Despite Ms. Valladares' repeated efforts to report and oppose the sexually harassing and otherwise hostile working environment created by Hertzog, Maldonado, and the other Defendants, the Defendants and their agents did nothing to appropriately remedy the situation.

171.    Upon information and belief, no investigation has taken place by the Defendants.

172.    Upon information and belief, no mechanism has been established to prevent such sexual harassment from happening again.

173.    Since reporting the sexual harassment as explained above, in addition to being subjected to an increasingly intolerable working environment and a changing schedule, Ms. Valladares' employers transferred Ms. Valladares away from her Williston Park office and split her between National Dental's Oakland Gardens and Douglaston offices.

## FIRST CAUSE OF ACTION

### Title VII – Sexual Harassment

174.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

175.    The Defendants intentionally discriminated against the Plaintiffs by creating and maintaining a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

176.    The sexually hostile work environment created by the Defendants was severe, pervasive, and a part of a pattern or practice of harassment against the Plaintiffs.

177.    The hostile working environment altered the Plaintiffs' conditions of employment by creating an abusive, physically threatening, humiliating, and intolerable working environment.

178.    The Plaintiffs complained about the sexual harassment to which they were subjected. But the Defendants took no action to stop the sex-based, offensive, unwelcomed, unsolicited, and illegal behavior that was directed towards the Plaintiffs.

179.    Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand had the power to hire, fire, and alter the terms and conditions of the Plaintiffs' employment.

180.    The Corporate Defendants, through and together with the Individual Defendants, participated in the conduct giving rise to the harassment and hostile work environment based on the Plaintiffs' sex that altered the terms and conditions of their employment.

181.    As a direct and proximate consequence of the Defendants' intentional, unlawful, and discriminatory treatment of the Plaintiffs, they have suffered and continue to suffer damages, including, but not limited to, compensatory  damages due to emotional distress and mental anguish.

182.    By reason of the sexual harassment perpetrated by the Defendants, the Plaintiffs are entitled to all damages available to them under Title VII.

## SECOND CAUSE OF ACTION

### New York State Human Rights Law – Sexual Harassment

183.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

184.    The Defendants intentionally discriminated against the Plaintiffs by creating and maintaining a sexually hostile work environment in violation of New York State Executive Law § 296 *et seq.*

185.    The sexually hostile work environment created by the Defendants was severe, pervasive, and a part of a pattern or practice of harassment against the Plaintiffs.

186.    The hostile working environment altered the Plaintiffs' conditions of employment by creating an abusive, physically threatening, humiliating, and intolerable working environment.

187.    The Plaintiffs complained about the sexual harassment to which they were subjected. But the Defendants took no action to stop the sex-based, offensive, unwelcomed, unsolicited, and illegal behavior that was directed towards the Plaintiffs.

188.    Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand had the power to hire, fire, and alter the terms and conditions of the Plaintiffs' employment.

189.    The Corporate Defendants, through and together with the Individual Defendants, participated in the conduct giving rise to the harassment and hostile work environment based on the Plaintiffs' sex that altered the terms and conditions of their employment.

190.    The Individual Defendants aided, abetted, incited, compelled, and/or coerced a hostile work environment based on the Plaintiffs' sex by directly and purposefully participating in conduct giving rise to or facilitating the unlawful harassment and hostile work environment prohibited under New York State Human Rights Law. *See* N.Y. Exec. Law § 290 *et seq.*

191.    The Individual Defendants aided, abetted, incited, compelled, and/or coerced a hostile work environment based on the Plaintiffs' sex by failing to promptly investigate or take

30

appropriate remedial measures despite being informed about the existence of discriminatory conduct.

192.    Further, the Defendants condoned the acts of sexual harassment and hostile working environment detailed above in violation of New York State Human Rights Law. *See* N.Y. Exec. Law § 290 *et seq.*

193.    As a direct and proximate consequence of the Defendants' intentional, unlawful, and discriminatory treatment of the Plaintiffs, they have suffered and continue to suffer damages, including, but not limited to, compensatory  damages due to emotional distress and mental anguish.

194.    By reason of the sexual harassment perpetrated by the Defendants, the Plaintiffs are entitled to all damages available to them under New York State Human Rights Law.

### THIRD CAUSE OF ACTION

### New York City Human Rights Law – Sexual Harassment

195.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

196.    The Defendants intentionally discriminated against the Plaintiffs by creating and maintaining a sexually hostile work environment in violation of New York City Administrative Code § 8-107.

197.    The sexually hostile work environment created by the Defendants was severe, pervasive, and a part of a pattern or practice of harassment against the Plaintiffs.

198.    Plaintiffs were treated less well than other employees because of their sex.

31

199.    The hostile working environment altered the Plaintiffs' conditions of employment by creating an abusive, physically threatening, humiliating, and intolerable working environment.

200.    The Plaintiffs complained about the sexual harassment to which they were subjected. But the Defendants took no action to stop the sex-based, offensive, unwelcomed, unsolicited, and illegal behavior that was directed towards the Plaintiffs.

201.    Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand had the power to hire, fire, and alter the terms and conditions of the Plaintiffs' employment.

202.    The Corporate Defendants, through and together with the Individual Defendants, participated in the conduct giving rise to the harassment and hostile work environment based on the Plaintiffs' sex that altered the terms and conditions of their employment.

203.    The Individual Defendants aided, abetted, incited, compelled, and/or coerced a hostile work environment based on the Plaintiffs' sex by directly and purposefully participating in conduct giving rise to or facilitating the unlawful harassment and hostile work environment prohibited under New York City Administrative Code § 8-107.

204.    The Individual Defendants aided, abetted, incited, compelled, and/or coerced a hostile work environment based on the Plaintiffs' sex by failing to promptly investigate or take appropriate remedial measures despite being informed about the existence of discriminatory conduct.

205.    Further, the Defendants condoned the acts of sexual harassment and hostile working environment detailed above in violation of New York City Administrative Code § 8-107.

206.    As a direct and proximate consequence of the Defendants' intentional, unlawful, and discriminatory treatment of the Plaintiffs, they have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

207.    By reason of the sexual harassment perpetrated by the Defendants, the Plaintiffs are entitled to all damages available to them under New York City Human Rights Law.

## FOURTH CAUSE OF ACTION

### Title VII – Retaliation

208.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

209.    The Plaintiffs complained about the sexually hostile working environment to which they were subjected.

210.    The issues raised by the Plaintiffs to the Defendants constitute colorable violations of Title VII's prohibitions concerning discrimination on the basis of sex.

211.    The Defendants retaliated against the Plaintiffs for engaging in protected activities of reporting and opposing the sexually hostile working environment to which they were being subjected.

212.    In violation of Title VII, Defendants retaliated against the Plaintiffs in a way that interfered with their terms and conditions of employment.

213.    The Defendants' retaliatory and discriminatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

214.    The Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand had the power to hire, fire, and alter the terms and conditions of the Plaintiffs' employment.

33

215.    The Corporate Defendants, through and together with the Individual Defendants, participated in the conduct giving rise to the retaliation based on the Plaintiffs engaging in protected activity.

216.    As a direct and proximate consequence of the Defendants' intentional, unlawful, discriminatory, and retaliatory treatment of the Plaintiffs, they have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

217.    By reason of the retaliation perpetrated by Defendants, the Plaintiffs are entitled to all damages available to them under Title VII.

## FIFTH CAUSE OF ACTION

### New York State Human Rights Law – Retaliation

218.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

219.    The Plaintiffs complained about the sexually hostile working environment to which they were subjected.

220.    The issues raised by the Plaintiffs to the Defendants constitute colorable violations of New York State Human Rights Law's prohibitions concerning discrimination on the basis of sex.

221.    The Defendants retaliated against the Plaintiffs for engaging in protected activities of reporting and opposing the sexually hostile working environment to which they were being subjected.

222.    In violation of New York Executive Law § 296, Defendants retaliated against the Plaintiffs in a way that interfered with their terms and conditions of employment.

223. The Defendants' retaliatory and discriminatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

224. The Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand had the power to hire, fire, and alter the terms and conditions of the Plaintiffs' employment.

225. The Corporate Defendants, through and together with the Individual Defendants, participated in the conduct giving rise to the retaliation based on the Plaintiffs engaging in protected activity.

226. The Individual Defendants aided, abetted, incited, compelled, and/or coerced the retaliation based on the Plaintiffs engaging in protected activity by directly and purposefully participating in conduct giving rise to unlawful retaliation.

227. The Individual Defendants aided, abetted, incited, compelled, and/or coerced the retaliation based on the Plaintiffs' complaints of the hostile work environment maintained by Defendants by failing to promptly investigate or take appropriate remedial measures despite being informed about the existence of the said conduct.

228. Further, the Individual Defendants condoned the acts of sexual harassment, hostile working environment, and retaliation detailed above in violation of New York Executive Law § 296.

229. As a direct and proximate consequence of the Defendants' intentional, unlawful, discriminatory, and retaliatory treatment of the Plaintiffs, they have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

230. By reason of the retaliation perpetrated by Defendants, the Plaintiffs are entitled to all damages available to them under New York State Human Rights Law.

## SIXTH CAUSE OF ACTION

### New York City Human Rights Law – Retaliation

231.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

232.    The Plaintiffs complained about the sexually hostile working environment to which they were subjected.

233.    The issues raised by the Plaintiffs to the Defendants constitute colorable violations of New York City Human Rights Law's prohibitions concerning discrimination on the basis of sex.

234.    The Defendants retaliated against the Plaintiffs for engaging in protected activities of reporting and opposing the sexually hostile working environment to which they were being subjected.

235.    In violation of New York City Administrative Code § 8-107, Defendants retaliated against the Plaintiffs in a way that interfered with their terms and conditions of employment.

236.    The Defendants' retaliatory and discriminatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

237.    The Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand had the power to hire, fire, and alter the terms and conditions of the Plaintiffs' employment.

238.    The Corporate Defendants, through and together with the Individual Defendants, participated in the conduct giving rise to the retaliation based on the Plaintiffs engaging in protected activity.

36

239.     The Individual Defendants aided, abetted, incited, compelled, and/or coerced the retaliation based on the Plaintiffs engaging in protected activity by directly and purposefully participating in conduct giving rise to unlawful retaliation.

240.     The Individual Defendants aided, abetted, incited, compelled, and/or coerced the retaliation based on the Plaintiffs' complaints of the hostile work environment maintained by Defendants by failing to promptly investigate or take appropriate remedial measures despite being informed about the existence of the said conduct.

241.     Further, the Individual Defendants condoned the acts of sexual harassment, hostile working environment, and retaliation detailed above in violation of New York City Human Rights Law.

242.     As a direct and proximate consequence of the Defendants' intentional, unlawful, discriminatory, and retaliatory treatment of the Plaintiffs, they have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

243.     By reason of the retaliation perpetrated by Defendants, the Plaintiffs are entitled to all damages available to them under New York City Human Rights Law.

## SEVENTH CAUSE OF ACTION

### Negligent Hiring, Supervision, & Retention

244.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

245.     As a result of Defendants National Dental, Prestige, Doshi, Berry, Maldonado, and Gelfand's gross negligence, the Plaintiffs experienced, *inter alia*, sexual harassment, retaliation, physical harm, anxiety, and emotional distress.

246.     These Defendants placed their employees in a position to cause foreseeable harm, harm that the Plaintiffs would have been spared had these Defendants taken reasonable care in making decisions concerning the hiring, supervision, and retention of Hertzog.

247.     These Defendants knew, or should have known, of Hertzog's propensity for the abovementioned conduct that caused the injuries of the Plaintiffs.

248.     These Defendants, as outlined above, hired Hertzog either knowing of his criminal and sexually harassing history or under circumstances through which they should have known of the same.

249.     As a direct and proximate result of the aforementioned conduct, perpetrated by the Defendants, Plaintiffs were damages and suffered mental and emotional harm, anguish, anxiety, and humiliation.

250.     By reason of these Defendants' failure to exercise due care in the hiring, supervision, and retention of employees, Plaintiffs suffered sexual harassment and retaliation. Therefore, Plaintiffs are entitled to all damages permitted by law.

## EIGHTH CAUSE OF ACTION

### Title VII – Constructive Discharge

251.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

252.     Plaintiffs were constructively discharged based on their sex when they were subjected to the Defendants sexual harassment / hostile working environment and retaliation, despite the Defendants' knowledge about such unlawful behavior, in violation of Title VII, 42 U.S.C. § 2000e *et seq*.

253.   The working conditions resulting from the Defendants' sexual harassment / hostile working environment and retaliation were so intolerable that a reasonable person in the respective employee's situation, such as the Plaintiffs, would have felt compelled to resign.

254.   As a direct and proximate consequence of the Defendants' intentional, unlawful, discriminatory, and retaliatory treatment, which led to the constructive discharge of the Plaintiffs, the Plaintiffs have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

255.   By reason of the retaliation perpetrated by Defendants, the Plaintiffs are entitled to all damages available to them under Title VII.

### NINTH CAUSE OF ACTION

### New York State Human Rights Law – Constructive Discharge

256.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

257.   Plaintiffs were constructively discharged based on their sex when they were subjected to the Defendants sexual harassment / hostile working environment and retaliation, despite the Defendants' knowledge about such unlawful behavior, in violation of New York State Human Rights Law § 296 *et seq*.

258.   The working conditions resulting from the Defendants' sexual harassment / hostile working environment and retaliation were so intolerable that a reasonable person in the respective employee's situation, such as the Plaintiffs, would have felt compelled to resign.

259.   As a direct and proximate consequence of the Defendants' intentional, unlawful, discriminatory, and retaliatory treatment, which led to the constructive discharge of the

Plaintiffs, the Plaintiffs have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

260.   By reason of the retaliation perpetrated by Defendants, the Plaintiffs are entitled to all damages available to them under New York State Human Rights Law.

## TENTH CAUSE OF ACTION

### New York City Human Rights Law – Constructive Discharge

261.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as though fully set forth herein.

262.   Plaintiffs were constructively discharged based on their sex when they were subjected to the Defendants sexual harassment / hostile working environment and retaliation, despite the Defendants' knowledge about such unlawful behavior, in violation of New York City Administrative Code § 8-107 *et seq*.

263.   The working conditions resulting from the Defendants' sexual harassment / hostile working environment and retaliation were so intolerable that a reasonable person in the respective employee's situation, such as the Plaintiffs, would have felt compelled to resign.

264.   As a direct and proximate consequence of the Defendants' intentional, unlawful, discriminatory, and retaliatory treatment, which led to the constructive discharge of the Plaintiffs, the Plaintiffs have suffered and continue to suffer damages, including, but not limited to, compensatory damages due to emotional distress and mental anguish.

265.   By reason of the retaliation perpetrated by Defendants, the Plaintiffs are entitled to all damages available to them under New York City Human Rights Law.

## PRAYER FOR RELIEF

**WHEREFORE,** upon all of the facts, allegations, and causes of action as set forth and alleged herein, Plaintiffs respectfully request that this Court:

A.      Grant judgment against Defendants as to each and every cause of action herein alleged;

B.      Grant judgment declaring that the actions and practices of Defendants violated the Plaintiffs' civil rights under each cause of action alleged herein and enjoining such violations;

C.      Grant an order awarding Plaintiffs damages in an amount to be determined at trial, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees, punitive damages sufficient to punish and deter the continuation of Defendants' unlawful employment practices, as well as any other damages permitted to be recovered by law pursuant to the above causes of action; and

D.      Grant any such further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: May 12, 2019
       Garden City, New York

                              **GERSTMAN SCHWARTZ LLP**

                     By:      _____
                              Bradley L. Gerstman, Esq.
                              David M. Schwartz, Esq.
                              1399 Franklin Avenue, Suite 200
                              Garden City, New York 11530
                              Tel. No.: (516) 880 – 8170

                              *Counsel for Plaintiffs*

41